[Cite as *State ex rel. Honda of Am. Mfg., Inc. v. Indus. Comm. of Ohio*, 2019-Ohio-1006.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Honda of America Mfg., Inc., | : | |
| Relator, | : | |
| | : | No. 18AP-4 |
| v. | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio et al., | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on March 21, 2019

**On brief:** *Vorys, Sater, Seymour and Pease LLP*, and *Robert A. Minor*, for relator.

**On brief:** *Michael DeWine*, Attorney General, and *Crystal R. Richie*, for respondent Industrial Commission of Ohio.

**On brief:** *Stanley R. Jurus Law Office*, and *Michael J. Muldoon*, for respondent Debra Phipps.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

SADLER, J.

{¶ 1} Relator, Honda of America Manufacturing, Inc., commenced this original action requesting a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the August 14, 2017 order awarding permanent total disability ("PTD") compensation to respondent Debra Phipps ("claimant") and to enter an order denying the compensation.

{¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued the

appended decision, including findings of fact and conclusions of law, and recommended this court deny claimant's request for a writ of mandamus.

{¶ 3}   In this case, claimant sustained numerous work-related injuries to various parts of her body over the course of her employment with relator.  As a result, claimant has five industrial claims.  Claimant also suffers from several non-allowed medical conditions, some of which affect the same body parts involved in her industrial claims.  The magistrate determined that, contrary to relator's assertions, the commission awarded PTD compensation based solely on claimant's allowed conditions and did not abuse its discretion by omitting consideration of the *Stephenson* non-medical disability factors.

{¶ 4}   Relator has filed objections to the magistrate's decision.   In relator's objections, relator contends the commission erroneously relied on the medical opinion of Ronald J. Bloomfield, M.D., in granting PTD for two reasons: 1) Dr. Bloomfield considered non-allowed conditions in reaching his opinion; and 2) pursuant to the decision of the Supreme Court of Ohio in *State ex rel. Bonnlander v. Hamon*, 150 Ohio St.3d 567, 2017-Ohio-4003, Dr. Bloomfield's finding that claimant "can perform activities for a couple of hours at most" is incompatible with his conclusion that claimant is not capable of sustained remunerative employment.   (Appx. at ¶ 20.)   Relator further contends that because Dr. Bloomfield's report fails to support the conclusion that claimant is medically incapable of engaging in sustained remunerative employment due to the allowed impairment, the commission was required to consider the relevant non-medical disability factors before granting PTD, including claimant's failure to participate in re-education or retraining.

{¶ 5}   Relator acknowledges the magistrate considered and rejected each of the above-cited arguments in recommending we deny the requested writ of mandamus. Relator's objections to the magistrate's decision merely summarize and reiterate the arguments made in its brief to the magistrate.  Our review of the magistrate's decision convinces us the magistrate did not err in rejecting relator's arguments.

{¶ 6}   More particularly, we agree with the magistrate that Dr. Bloomfield's opinion provides some evidence on which the commission may rely in support of the Staff Hearing Officer's determination that claimant is medically incapable of sustained remunerative employment due solely to the allowed conditions in her industrial claims.  Though Dr. Bloomfield mentioned claimant's non-allowed condition in his report, his opinion on PTD

was based solely on the allowed conditions in her claim.  We also note, contrary to relator's assertion, the magistrate correctly applied the rule of law expressed in *Bonnlander* to the specific facts of this case.  We also agree with the magistrate that, in light of Dr. Bloomfield's opinion that claimant is incapable of sustained remunerative employment due to her allowed impairment, the commission was not required to consider non-medical disability factors before granting PTD, including claimant's lack of participation in re-education and retraining.  *State ex rel. R & L Carriers Shared Servs., L.L.C. v. Indus. Comm.,* 151 Ohio St.3d 568, 2017-Ohio-5833, ¶ 18-19.  *See also* Ohio Adm.Code 4123-3-34(D)(2)(a).

{¶ 7}  Following an independent review of the magistrate's decision and the objections filed by relator, we find the magistrate has determined the pertinent facts and properly applied the relevant law.  Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein.  For the reasons set forth in the magistrate's decision and those expressed herein, relator's objections are overruled, and we deny the requested writ of mandamus.

*Objections overruled; writ denied.*

BROWN and BRUNNER, JJ., concur.

_____

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

The State ex rel.                                           :
Honda of America Mfg., Inc.,

                                                            :
            Relator,

                                                            :

v.                                                                              No.  18AP-4

                                                            :

Industrial Commission of Ohio et al.,                           (REGULAR CALENDAR)

                                                            :

            Respondents.

                                                            :

---

### M A G I S T R A T E ' S   D E C I S I O N

#### Rendered on July 30, 2018

---

*Vorys, Sater, Seymour and Pease LLP,* and *Robert A. Minor,* for relator.

*Michael DeWine,* Attorney General, and *Crystal R. Richie,* for respondent Industrial Commission of Ohio.

*Stanley R. Jurus Law Office,* and *Michael J. Muldoon,* for respondent Debra Phipps.

---

### IN MANDAMUS

{¶ 8}   In this original action, relator, Honda of America Mfg., Inc., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the August 14, 2017 order of its staff hearing officer ("SHO") that awards permanent total disability ("PTD") compensation to respondent Debra Phipps ("claimant"), and to enter an order denying the compensation.

<u>Findings of Fact</u>

{¶ 9}   1.  Claimant has five industrial claims arising in the course of her employment with relator.

{¶ 10} 2.  Her first claim (No. 95-359544) arose from an injury on April 10, 1995. The claim is allowed for:  "Left lateral epicondylitis; bursitis left shoulder; borderline left carpal tunnel syndrome."

{¶ 11} 3.  Her second claim (No. 97-626787) arose from an injury on August 1, 1997. The claim is allowed for:

> Left shoulder strain; left rotator cuff tendonitis; partial tear
> left rotator cuff; C-7 left radiculopathy; partial supraspinatus
> tear left shoulder; distal clavicle osteoarthritis.

{¶ 12} 4.  Her third claim (No. 99-623969) arose from an injury on October 1, 1999. The claim is allowed for:  "Left hip strain; left knee strain; left S1 radiculopathy."

{¶ 13} 5.  Her fourth claim (No. 99-624209) arose from an injury on October 19, 1999.  The claim is allowed for:  "Right shoulder strain, right shoulder supraspinatus cuff tear; recurrent right rotator cuff tear; right hip bursitis."

{¶ 14} 6.  Her fifth claim (No. 01-870520) arose from an injury on August 17, 2001. The claim is allowed for:

> Right carpal tunnel syndrome; right radial tunnel syndrome;
> chronic right C-6 radiculopathy; right elbow lateral
> epicondylitis.

{¶ 15} 7.  On October 3, 2015, chiropractor, David M. Grunstein, D.C., wrote to claimant's counsel.  In his eight-page report, Dr. Grunstein concludes:

> *OPINION: Based on the consultation and examination
> findings above stated and how these findings correlate with
> the A.M.A. Guides, it is my opinion that the above named
> presented in this office with a total whole person impairment
> of **70 percent whole person impairment,** on the above
> stated date, for the above stated conditions. Also note that
> when considering the above stated information and attached
> functional capacities evaluation, I am of the opinion that
> these injuries have resulted in this person being
> **permanently and totally disabled from partaking in
> any type of sustained gainful remunerative
> employment and is therefore permanently and
> totally disabled.**

(Emphasis sic.)

{¶ 16} 8.  On February 7, 2017, claimant filed an application for PTD compensation. In support, claimant submitted the October 3, 2015 report of Dr. Grunstein.

{¶ 17} 9. The PTD application prompted relator to have claimant examined by orthopaedic surgeon Oscar F. Sterle, M.D. Following an April 10, 2017 examination, Dr. Sterle prepared a 35-page report dated April 14, 2017. At pages 32 through 35 of his report, Dr. Sterle opines:

> I examined Ms. Phipps in the Dublin, Ohio, office for the allowed conditions of left lateral epicondylitis; bursitis left shoulder; borderline left carpal tunnel syndrome; left shoulder strain; left rotator cuff tendonitis; partial tear left rotator cuff; C-7 left radiculopathy; partial supraspinatus tear left shoulder; distal clavicle osteoarthritis; strain left knee; strain left hip; left S1 radiculopathy; strain right shoulder; tear supraspinatus cuff right shoulder; right rotator cuff tear; right hip bursitis; right carpal tunnel syndrome; right radial tunnel syndrome; chronic right C6 radiculopathy; and right elbow lateral epicondylitis.
>
> **[One] Does the claimant retain the capacity to engage in sustained, remunerative employment considering the impairments resulting from the allowed conditions in Claim Nos. 95-359544, 97-626787, 99-623969, 99-624209 and/or 01-870520?**
>
> Based on review of the available medical records, the reported mechanisms of injuries for each claim outlined above, considering the allowed claim conditions for each claim (95-359544, 97-626787, 99-623969, 99-624209 and/or 01-870520), I find that Ms. Phipps is capable of engaging in sustained remunerative employment.
>
> The allowed conditions from claim number **95-359544** are soft tissue conditions, which have long since resolved. The claim allowance includes left lateral epicondylitis which Ms. Phipps has no complaints nor objective findings supporting the continuation of this allowed condition.
>
> Left shoulder bursitis was treated within the other claims, with ultimately the claimant undergoing a reverse total shoulder arthroplasty (performed outside the workers' compensation system).
>
> Ms. Phipps has functional range of motion in the left shoulder following her left shoulder arthroplasty.

Ms. Phipps underwent a carpal tunnel release on the left wrist, without residuals as outlined on the electrodiagnostic study completed on June 11, 2010.

The allowed condition in claim number **97-626787** have resolved with the claimant ultimately undergoing a reverse total shoulder arthroplasty, outside the workers' compensation system. The left shoulder allowed conditions included left shoulder strain, left rotator cuff tendonitis, partial tear left rotator cuff, partial supraspinatus tendon tear left shoulder and distal clavicle osteoarthritis. These conditions can be considered resolved.

The allowed condition of C7 left radiculopathy is not supported by objective clinical findings. Ms. Phipps has age related pre-existing multilevel cervical degenerative disc and spinal disease as noted on the MRI of the cervical spine dating from February 21, 2003. These findings were further denoted on the repeat Cervical MRI study dating from November 17, 2003.

In claim number **99-623969**, the conditions of strain left knee and strain left hip are soft tissue and self-limiting conditions which have long since resolved. The objective findings and subjective complaints relate to underlying degenerative conditions and not the resolved soft tissue diagnoses.

The allowed left S1 radiculopathy is an electrodiagnostic finding without objective findings for correlation. Ms. Phipps has moderate lumbar multilevel degenerative disc and facet joint disease. The left S1 radiculopathy was not supported by objective findings on examination, as found in the medical records and on my Independent Medical Examination.

Claim number **99-624209**, involves the right shoulder for which Ms. Phipps ultimately underwent a reverse total shoulder arthroplasty, through the workers' compensation system, without complication and has expected results. She has functional range of motion in the right shoulder.

Right hip bursitis, according to the claimant is symptomatic; however, this condition would not preclude the claimant for sustained remunerative activities. On examination, the claimant reported tenderness to the trochanteric bursal area bilateral on light palpation.

The allowed conditions for claim number **01-870520** have resolved with no objective or diagnostic findings associated with right carpal tunnel syndrome, right radial tunnel syndrome and right elbow lateral epicondylitis.

The additional allowance of C6 radiculopathy is without clinical correlation and as of June 2010 was no long[er] reported on electrodiagnostic study.

Ms. Phipps has age related pre-existing multilevel cervical degenerative disc and spinal disease as noted on the MRI of the cervical spine dating from February 21, 2003. These findings were further denoted on the repeat Cervical MRI study dating from November 17, 2003.

**[Two]   Irrespective of her capacity to engage in sustained remunerative employment, is the claimant able to engage in physical and/or vocational rehabilitation efforts to be retrained to return to some form of sustained remunerative employment?**

Ms. Phipps is capable to engage in sustained remunerative employment, and should be capable of engaging in physical and/or vocational rehabilitation in an effort to be ret[r]ained to return to some form of sustained remunerative employment.

However, the claimant has been retired for a few years.

**[Three] Are there other physical conditions that interfere with, or prohibit, Ms. Phipps engaging in sustained, remunerative employment? If so, do the injuries sustained at Honda contribute in any meaningful way to her inability to work?**

Ms. Phipps has multiple soft tissue complaints without corresponding objective findings as well as underlying multiple joint osteoarthritis, affecting her neck, back, hips and knees. This multiple joint osteoarthritis is unrelated to the allowed claims conditions and is a driving force in the current multiple area disabilities and perceived inability to work.

The allowed conditions of this claim, do not affect the claimant's ability to work.

**[Four] If the claimant is able to engage in some form of sustained remunerative employment, what**

**physical restrictions/limitations, if any, do the allowed physical conditions in her claims presently cause? Please also complete the enclosed Physical Strength Rating form.**

Ms. Phipps would require physical restrictions for any overhead activities with both shoulder[s] and would benefit from a limitation on lifting over twenty-five pounds.

In addition, there is a component of deconditioning from her current sedentary lifestyle and perceived accumulative ailments from working for "28 years in that place."

The only residuals affecting the claimant from the multiple workplace claims affect the shoulders, for which arthroplasty surgery was performed.

The above analysis derives from the history provided by the examinee, the findings on my examination, and the information contained in the medical records. * * *

* * *

This evaluation was based on standards by the American Medical Association in their *Guides to the Evaluation of Permanent Impairment,* Fifth Edition.

(Emphasis sic.)

{¶ 18} 10. On May 16, 2017, at the commission's request, claimant was examined by Ronald J. Bloomfield, M.D., who specializes in internal medicine and occupational medicine. In his nine-page narrative report, Dr. Bloomfield states:

**CLAIM ALLOWANCE(S):**

01-870520- Right carpal tunnel syndrome, right radial tunnel syndrome, chronic right C-6 radiculopathy, right elbow lateral epicondylitis.

95-359544- Left lateral epicondylitis, bursitis left shoulder, borderline left carpal tunnel syndrome.

97-626787- Left shoulder strain, left rotator cuff tendonitis, partial tear left rotator cuff, C-7 left radiculopathy, partial supraspinatus tear left shoulder, distal clavicle osteoarthritis.

99-623969- Left hip strain, left knee strain, left S1 radiculopathy.

99-624209- Right shoulder strain, right shoulder supraspinatus cuff tear, recurrent right rotator cuff tear, right hip bursitis.

* * *

**OCCUPATIONAL HISOTRY:** Debra K. Phipps worked at Honda Manufacturing of America in assembly for 28 years, and she left work in June 2012. All five of her industrial claims were working at Honda Manufacturing. She always worked assembly line, although different positions over these years. She never had any sedentary jobs but worked on different assembly lines and assembling different parts of cars.

**HISTORY OF THE PRESENT CONDITION:** As noted, all of her jobs were working at Honda of America in assembly lines doing repetitive work. Her 1995 injury caused bursitis to the left shoulder with left lateral epicondylitis and left carpal tunnel syndrome. She did not undergo any surgeries.

Her next injury was in 1997 when she injured her left shoulder and also was allowed C7 left radiculopathy. She underwent three left shoulder surgeries and eventual[ly] open rotator cuff repair.

She was injured twice in 1999, first on October 1st, when she injured her left hip, left knee, and was also allowed a left S1 radiculopathy. She did not undergo any surgeries. However, on October 19, 1999, just 18 days later, she injured her right shoulder and right hip and underwent three right shoulder surgeries including right reverse total shoulder arthroplasty. These three surgeries did not occur until after she left the workplace.

Her last industrial injury was in 2001 when she injured her right upper extremity and also aggravated her chronic right C6 radiculopathy. She did undergo right carpal tunnel release surgery.

She is scheduled for right hip replacement surgery and has already undergone left total hip replacement. She says the left total hip replacement was not covered by BWC, and she is doubtful that the right total hip replacement will be covered

by BWC, although she hopes so. She has been allowed right hip bursitis.

All in all, under these five different claims, she has undergone multiple surgeries, which include right carpal tunnel, right total shoulder replacement, three left shoulder surgeries. She says that she has also undergone left shoulder replacement surgery, although it is not listed in the forms sent to me. She also claims to have undergone left carpal tunnel surgery, although that is not apparently due to a BWC work injury.

She has had multiple cortisone injections in both shoulders, both elbows, both wrists, but none in the spine. She has participated in physical therapy, takes over-the-counter pain medications, and says that she is limited much more by weakness and inability to use the upper extremities and ambulate well than she is by pain. Except for the right hip total replacement, she does not expect to undergo anymore surgeries.

**CURRENT SYMPTOMS:** She has some pain, but it is not significant and uses over-the-counter analgesics. She has tried prescription opioids. She did not like the feeling. She says that she had significant reaction to OxyContin and refuses to take opioids.

She says that she is unable to do very much with her wrist. She says that she gets a significant fatigue. For example, last Christmas, they were sending out Christmas cards. She would be able to complete five cards writing on them, putting them in envelopes, sealing the envelopes and addressing the envelopes before she would have to take a break of anywhere up to 20 or 30 minutes, but she could start doing more Christmas cards.

She is able to prepare food and cook and do laundry, but says she has significant difficulty reaching over her head or carrying anything including a gallon of milk. She occasionally drives a car, although she relies on her husband to do all the carrying of the groceries into the house, putting things away.

In conclusion, pain is not a significant limiting factor, and she does not have pain at all times. She take ibuprofen and Tylenol as needed for pain relief and finds good relief. However, she says that her shoulders and her wrists, her hips wear out very quickly and cause significant fatigue. She has weakness in all six of these joints and then has to sit down.

**IMPACT ON ACTIVITIES:** Occasionally she uses a cane in the right hand when her right hip is bothering her. She is able to do all of her household duties, although she goes slowly and she cannot carry the laundry, but she is able to bend over and do the laundry. She does prepare meals, drives herself to appointments and short distances and walks her dog.

She needs not [sic] assistance with any activity of daily living. She reads a lot, watches television and goes camping. Camping involves her and her husband going in the 32-foot RV. They sleep in the RV. She does not like to fish and they just get out and sit next to the RV and appreciate being in the country. They do not do hunting either.

She has a dog. She frequently walks the dog and she is able to bend over and pick up after the dog.

**PAST MEDICAL HISTORY:** In addition to her five industrial injuries, she is treated for hypertension, hypercholesterolemia, asthma, and hiatal hernia.

* * *

In addition to her musculoskeletal surgeries in these five claims, she has undergone a cholecystectomy, T & A, total abdominal hysterectomy, appendectomy, and has had multiple surgeries on both knees.

* * *

**REVIEW OF MEDICAL RECORDS:** I reviewed all of the medical records provided to me by the Industrial Commission.

**PHYSICAL EXAMINATION:** The history portion of the examination was obtained with her husband, Rodney Phipps, present at all times. Ms. Phipps did not know how to operate the handicap elevator and walked up the stairs to our second floor office and was visibly exhausted on her arrival. I assisted her with use of elevator after the examination process was completed.

Mr. Phipps was not present during the physical examination. My office assistant, Ms. Somia Ahmed, was present at all times during the physical examination.

Height: 60 inches. Weight: 136 pounds. She has an antalgic gait, favors the right hip, and moves slowly. I used the ACUMAR dual digital inclinometer during parts of the exam.

She is a well-developed, well-nourished woman. She has a slightly antalgic gait. She does occasionally use a right cane, she tells me, but it is not with her today. She had significant difficulty, she told me, climbing up the stairs, which caused pain, and she took the elevator down.
* * *

She has well-healed surgical scars over both shoulders. In regards to the wrists, she has well-healed surgical scars, but they are faint from her previous carpal tunnel surgery. There is no tenderness when palpating in the carpal tunnel region on either wrist. In regards to the right wrist, extension is 50 degrees, flexion 50 degrees, ulnar and radial deviation 20 degrees. Similar findings were noted on the left. The left grasp was weaker than the right. In the supine position, there was significant tenderness with internal and external rotation of the right hip. There was also tenderness but not as much with internal and external rotation of the left hip. In the standing position, she was able to forward flex to 60 degrees, extension 30 degrees, right and lateral movements were unremarkable as well. She has brisk 3+ reflexes at both knees and 2+ at both Achilles' tendons. There were no neurological deficits noted in the lower extremities. There was no clubbing, cyanosis or edema with positive pedal pulses. The knees have long vertical surgical scars anteriorly right and left. She is able to extend both knees to zero degrees, flexion to 120 degrees.

{¶ 19} 11. Beginning at the bottom of page six and continuing through page eight, Dr. Bloomfield lists the 20 allowed conditions of the five industrial claims, and he rates each allowed condition for the percentage of whole person impairment using the AMA Guides, Fifth Edition. Using the combined values chart, Dr. Bloomfield opines that claimant has a combined whole person impairment of 40 percent.

{¶ 20} On the last page of his narrative report, Dr. Bloomfield responds to a request to "provide a discussion setting forth physical limitations arising from the allowed conditions." In response, Dr. Bloomfield wrote:

Ms. Phipps is incapable of work due to the cumulative effect of injury to both wrists, both elbows, both shoulders, both hips, left knee and cervical spine. For example, the simple task of sending out Christmas cards was difficult because of the

impairments in both upper extremities. She is physically unable to raise either upper extremity above the horizon and this would make it difficult for her to perform work activity and in addition to this she has bilateral carpal tunnel syndrome and bilateral epicondylitis which complicates and impairs her ability to perform repetitive work with her hands and/or use her upper extremities below the horizon. There is an accumulative effect on an individual when they have injury to all the major joints of both upper extremities.

Her ability to write and/or type is significantly impaired due to disease in both shoulders, both elbows and both wrists. While she can perform activities for a couple of hours at most she is not capable of performing activities with her upper extremities on a sustained basis. * * *

Pushing and pulling is markedly impaired due to her bilateral shoulder disease. An artificial joint may be marked improvement over a diseased joint, it is in no way as capable as the "original" uninjured joint.

She explained to me that she just wears out in a couple of hours of house work or walking her dog and this is expected due to injury to so many joints and the effects of multiple surgeries. While she has the stamina to perform all of her own activities of daily living she does not have the musculoskeletal ability to perform activities on a sustained basis; her joints simply are not that strong as evidenced by the limitations and pain noted on physical examination and results of her multiple surgeries.

{¶ 21} 12. The commission provides a form captioned "Physical Strength Rating." The form asks the examining physician to mark one of three pre-printed statements:

Based solely on impairment due to the allowed condition(s) in the claim within my specialty, and with no consideration of the injured worker's age, education, or work training.

{¶ 22} In response, Dr. Bloomfield placed his mark to indicate his agreement with the pre-printed statement: "This Injured Worker is incapable of work."

{¶ 23} 13. Following an August 14, 2017 hearing, an SHO issued an order awarding PTD compensation beginning May 16, 2017, which is the date of Dr. Bloomfield's examination.

{¶ 24} After listing the 20 allowed conditions of the five industrial claims, the SHO explained:

> The cost of this award is apportioned as follows: 50% in claim #99-624209, 25% in claim #97-626787, 10% in claim #01-870520, 10% in claim #99-623969 and 5% in claim #95-359544.
>
> This apportionment is based upon the significance of the medical treatment rendered and the residual impairment that persists relative to the allowed conditions in each claim. The Hearing Officer finds the most significant claims in this regard are 99-624209, which has entailed three right shoulder surgeries, including a right shoulder reverse arthroplasty in 2015; and 97-626787, which entailed three left shoulder surgeries. The remaining three claims: 01-870520, 99-623969, and 95-359544, account for residual impairment but involve remote surgical procedures and/or injections with infrequent follow-up office visits.
>
> Based upon the report [of] Ronald J. Bloomfield, M.D. dated 05/19/2017, it is found that the Injured Worker is unable to perform any sustained remunerative employment solely as a result of the medical impairment caused by the allowed physical conditions. Therefore, pursuant to *State ex rel. Speelman v. Indus. Comm.,* 73 Ohio App.3d 757, 598 N.E.2d 192 (10th Dist. 1992), it is not necessary to discuss or analyze the Injured Worker's non-medical disability factors. Permanent and total disability compensation is awarded from 05/16/2017 based on the examination performed by Dr. Bloomfield on said date. He opines that as the result of multiple surgeries to the Injured Worker's bilateral upper extremities, and the cumulative effect of the Injured Worker's injuries involving multiple joints of the body, she cannot raise her arms above the horizon, and her ability to perform repetitive work with her hands and write or type is significantly impaired. Dr. Bloomfield opines that as the result of the allowed conditions in the claim, the Injured Worker lacks the musculoskeletal ability to perform activities on a sustained basis and is incapable of work.

{¶ 25} 14. On September 21, 2017, relator moved for reconsideration.

{¶ 26} 15. On October 19, 2017, splitting two-to-one, the three-member commission denied reconsideration.

{¶ 27} 16.   On January 2, 2018, relator, Honda of America Mfg., Inc., filed this mandamus action.

Conclusions of Law:

{¶ 28} The main issue is whether the reports of Dr. Bloomfield provide some evidence to support the commission's finding that the medical impairment resulting from the allowed conditions alone prohibits all sustained remunerative employment and, thus, support a PTD award without reference to the vocational factors.

{¶ 29} Finding that the reports of Dr. Bloomfield provide some evidence to support the commission's finding and award of PTD compensation, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

## Basic Law: Non-Allowed Medical Conditions

{¶ 30} In a seminal case, the Supreme Court of Ohio held that non-allowed conditions cannot be used to advance or defeat a claim for compensation.  *State ex rel. Waddle v. Indus. Comm.*, 67 Ohio St.3d 452 (1993).  The mere presence of a non-allowed condition in a claim for compensation does not in itself destroy the compensability of the claim, but the claimant must meet his burden of showing that an allowed condition independently caused the disability.  *State ex rel. Bradley v. Indus. Comm.*, 77 Ohio St.3d 239, 242 (1997).  Even if non-allowed conditions are severe, they are irrelevant as long as the allowed conditions are independently disabling.  *State ex rel. WCI Steel, Inc. v. Indus. Comm.,* 96 Ohio St.3d 24, 2002-Ohio-3315.

{¶ 31} While it is the claimant's responsibility to establish a causal relationship between his allowed conditions and his claimed disability, he is not required to disprove a negative.  *State ex rel. Ignatious v. Indus. Comm.*, 99 Ohio St.3d 285, 2003-Ohio-3627, ¶ 33.  That is, having supplied evidence of a direct causal relationship between an allowed condition and his disability, a claimant is not required to further show that a non-allowed condition is not causing his inability to work.  *Id.* That is, the claimant does not have the burden of proof regarding the non-allowed conditions.  *Id.* at 32.

## Relevant Administrative Rules

{¶ 32} Ohio Adm.Code 4121-3-34 sets forth the commission's rules applicable to the adjudication of PTD applications.

{¶ 33} Ohio Adm.Code 4121-3-34(B) sets forth definitions.

{¶ 34} Ohio Adm.Code 4121-3-34(B)(3) is captioned "Vocational factors."

{¶ 35} Ohio Adm.Code 4121-3-34(D) provides guidelines for the adjudication of PTD applications.

{¶ 36} Thereunder, Ohio Adm.Code 4121-3-34(D)(2) provides:

> (a) If, after hearing, the adjudicator finds that the medical impairment resulting from the allowed condition(s) in the claim(s) prohibits the injured worker's return to the former position of employment as well as prohibits the injured worker from performing any sustained remunerative employment, the injured worker shall be found to be permanently and totally disabled, without reference to the vocational factors listed in paragraph (B)(3) of this rule.
>
> (b) If, after hearing, the adjudicator finds that the injured worker, based on the medical impairment resulting from the allowed conditions is unable to return to the former position of employment but may be able to engage in sustained remunerative employment, the non-medical factors shall be considered by the adjudicator.
>
> The non-medical factors that are to be reviewed are the injured worker's age, education, work record, and all other factors, such as physical, psychological, and sociological, that are contained within the record that might be important to the determination as to whether the injured worker may return to the job market by using past employment skills or those skills which may be reasonably developed. (Vocational factors are defined in paragraph (B) of this rule).

### Relator's Argument Regarding Non-Allowed Conditions

{¶ 37} It is important to note that the commission relied exclusively on the reports of Dr. Bloomfield in awarding PTD compensation. That is, the commission did not rely on the report of Dr. Sterle which relator uses here to support its argument that Dr. Bloomfield relies in part on non-allowed conditions in concluding that claimant is "incapable of work" as he indicates in the physical strength rating form he completed.

{¶ 38} Thus, analysis must begin with a review of the reports of Dr. Bloomfield. In his narrative report (dated May 19, 2017), Dr. Bloomfield repeatedly indicates that he is aware of all of the allowed conditions of the five industrial claims. On the first page of his report, he lists the allowed conditions of each industrial claim. Moreover, beginning on the sixth page of his report through the eighth page of his report, Dr. Bloomfield rates the whole

person impairment percentage of each of the 20 allowed conditions of the five industrial claims. It can be said that Dr. Bloomfield painstakingly indicates his awareness of all 20 allowed conditions.

{¶ 39} On the last page of his narrative report, Dr. Bloomfield renders his conclusion that claimant is unable to perform all sustained remunerative employment as a result of the allowed conditions. He writes:

> Ms. Phipps is incapable of work due to the cumulative effect of injury to both wrists, both elbows, both shoulders, both hips, left knee and cervical spine.

{¶ 40} Notwithstanding relator's suggestion to the contrary, claimant indeed has one or more allowed conditions relating to each of the body parts that are said to provide a cumulative effect of injury. Clearly, Dr. Bloomfield's statement need not be read as an indication that he is relying on non-allowed conditions in concluding that the cumulative effect produces an inability to perform sustained remunerative employment.

{¶ 41} According to relator, in his report, Dr. Sterle "reviewed the diagnostic studies and noted that the claimant had multilevel cervical degenerative disc and spinal disease in addition to multilevel lumbar degenerative disc disease and facet joint disease." (Relator's Brief at 13-14.) Dr. Sterle indicates at page 33 of his report that these conditions are shown "on the MRI of the cervical spine dating from February 21, 2003." Dr. Sterle indicates at page 34 of his report that the conditions were "further denoted on the repeat Cervical MRI study dating from November 17, 2003."

{¶ 42} Relator further points out that Dr. Sterle "found the claimant to have osteoarthritis affecting her neck, back and knees." (Relator's Brief at 14.) Dr. Sterle wrote that "multiple joint osteoarthritis is unrelated to the allowed claims conditions."

{¶ 43} According to relator, these conditions reported by Dr. Sterle from his review of the diagnostic studies are non-allowed conditions. Regardless, claimant has no burden to prove that the non-allowed conditions identified by Dr. Sterle are not the cause of disability. *Ignatious.*

{¶ 44} Relator further points out the following paragraph found at page two of Dr. Bloomfield's report:

> She is scheduled for right hip replacement surgery and has already undergone left total his replacement. She says the left

> total hip replacement was not covered by BWC, and she is doubtful that the right total hip replacement will be covered by BWC, although she hopes so. She has been allowed right hip bursitis.

{¶ 45} Nothing in the above-quoted paragraph from Dr. Bloomfield's report detracts from Dr. Bloomfield's opinion that claimant is incapable of work due to the allowed conditions of the five industrial claims. Again, the presence of one or more non-allowed conditions does not in itself destroy the compensability of the claim. *Bradley*.

{¶ 46} Based on the foregoing analysis, the magistrate concludes relator has failed to show that Dr. Bloomfield's report must be eliminated from commission consideration because of evidence of the existence of non-allowed conditions.

### The *Bonnlander* Case

{¶ 47} Relator argues that *State ex rel. Bonnlander v. Hamon,* 150 Ohio St.3d 567, 2017-Ohio-4003, compels this court to issue a writ of mandamus. The magistrate disagrees.

{¶ 48} As pointed out by the *Bonnlander* court, permanent total disability is defined as "the inability to perform sustained remunerative employment due to the allowed conditions in the claim." *Bonnlander* at ¶ 15, quoting Ohio Adm.Code 4121-3-34(B)(1). "Work is 'sustained' if it consists of an ongoing pattern of activity." *Id.*, citing *State ex rel. Kirby v. Indus. Comm.*, 97 Ohio St.3d 427, 2002-Ohio-6668. "To be considered sustained, work need not be regular or daily but may be intermittent and occasional." *Id.*, citing *State ex rel. McDaniel v. Indus. Comm.*, 118 Ohio St.3d 319, 2008-Ohio-2227. "[I]t may be part-time." *Id.,* citing *State ex rel. Toth v. Indus. Comm.*, 80 Ohio St.3d 360, 362 (1997).

{¶ 49} A closer review of the *Bonnlander* case is in order.

{¶ 50} Timothy Bonnlander applied for PTD compensation on February 28, 2014 following his industrial injury of October 13, 1992. The claim was allowed for numerous medical conditions and depressive disorder. At the commission's request, Bonnlander was examined by John J. Brannan, M.D., and Debjani Sinha, Ph.D.

{¶ 51} Dr. Brannan concluded that Bonnlander's medical conditions would not prevent him from performing sedentary work. Dr. Sinha evaluated Bonnlander's psychological condition and concluded that he was capable of working "part-time, up to 4 hours a day," with the following limitations: "accommodate for variable concentration;

routine jobs are more appropriate; minimal new learning on an ongoing basis; multiple breaks." *Id.* ¶ 4.

{¶ 52} Following a hearing, an SHO issued an order denying Bonnlander's PTD application. Relying on the reports of Drs. Brannan and Sinha, the SHO concluded that Bonnlander "could engage [in] sedentary employment activity which involves part-time work, up to four hours a day and also involves routine employment and minimal new learning on an ongoing basis. The sedentary work should also avoid overhead use of the right arm and avoid excessive lifting, bending and twisting." *Id.* at ¶ 5.

{¶ 53} The SHO also analyzed the non-medical disability factors in reaching his decision to deny the application.

{¶ 54} Bonnlander then filed a complaint in mandamus in this court. A magistrate concluded that Dr. Sinha's report supported the commission's decision. The magistrate held that Dr. Sinha's opinion that Bonnlander can work "up to 4 hours a day" met the standard for part-time work set forth in *State ex rel. Sheller-Chiles v. Indus. Comm.,* 10th Dist. No. 13AP-245, 2014-Ohio-313, ¶ 15.

{¶ 55} This court adopted the magistrate's decision and denied the writ. Bonnlander appealed as of right to the Supreme Court of Ohio.

{¶ 56} As stated by the Supreme Court in its decision, the issue is whether Dr. Sinha's report constitutes some evidence supporting the commission's order denying the PTD application.

{¶ 57} While affirming the judgment of this court, the Supreme Court observed that "[t]here is no statutory or administrative authority for [this court's] interpretation that four or more hours of work a day is the standard for sustained remunerative employment." *Bonnlander* at ¶ 17. Furthermore, the court "generally discourages bright-line rules in workers' compensation matters." *Id.* at ¶ 19.

{¶ 58} In *Bonnlander,* the Supreme Court held:

> [T]here is no hourly standard for determining one's capability to perform sustained remunerative employment on a part-time basis. The commission decides whether a claimant is capable of sustained remunerative employment on a case-by-case basis. Here, Dr. Sinha opined that Bonnlander's psychological condition limited him to four hours of work a day with multiple breaks. It was within the commission's discretion to rely on Dr. Sinha's report as evidence to support

> the conclusion that Bonnlander was capable of up to four hours of sedentary work a day.

*Id.* at ¶ 20.

{¶ 59} Relator argues that the *Bonnlander* case required the commission to read Dr. Bloomfield's report as indicating that claimant retains the residual functional capacity to perform at least part-time work on a sustained remunerative employment basis. Based on relator's own interpretation of Dr. Bloomfield's report, relator asserts that the commission's reliance on the report required the commission to consider the non-disability factors. In support of its argument, relator points to Dr. Bloomfield's statement:

> While she can perform activities for a couple of hours at most she is not capable of performing activities with her upper extremities on a sustained basis.

{¶ 60} According to relator, the above-quoted statement from Dr. Bloomfield's report required the commission to conclude that claimant retains the residual functional capacity for sustained remunerative employment. The magistrate disagrees.

{¶ 61} Clearly, and to the contrary of relator's argument, Dr. Bloomfield's assessment that claimant "can perform activities for a couple of hours at most," gave the commission the discretion to conclude that the statement is consistent with an inability to perform sustained remunerative employment.

{¶ 62} Based on the above analysis, the magistrate concludes that relator's reliance on *Bonnlander* is misplaced.

### Participation in Retraining

{¶ 63} Citing *State ex rel. Wilson v. Indus. Comm.*, 80 Ohio St.3d 250 (1997), relator asserts that the commission abused its discretion by allegedly failing to recognize "that there was no evidence that Ms. Phipps participated in vocational rehabilitation nor took other steps to ameliorate her situation." (Relator's Brief at 17.)

{¶ 64} In *Wilson,* the Supreme Court of Ohio states:

> We view permanent total disability compensation as compensation of last resort, to be awarded only when all reasonable avenues of accomplishing a return to sustained remunerative employment have failed. Thus, it is not unreasonable to expect a claimant to participate in return-to-work efforts to the best of his or her abilities or to take the initiative to improve reemployment potential. While

extenuating circumstances can excuse a claimant's nonparticipation in reeducation or retraining efforts, claimants should no longer assume that a participatory role, or lack thereof, will go unscrutinized.

*Id.* at 253.

{¶ 65} Relator cites R.C. 4123.58(D)(4), which states:

(D) Permanent total disability shall not be compensated when the reason the employee is unable to engage in sustained remunerative employment is due to any of the following reasons, whether individually or in combination:

* * *

(4) The employee has not engaged in educational or rehabilitative efforts to enhance the employee's employability, unless such efforts are determined to be in vain.

{¶ 66} The magistrate disagrees with relator that the commission abused its discretion with respect to retraining.

{¶ 67} In *State ex rel. R & L Carriers Shared Servs., L.L.C. v. Indus. Comm.,* 151 Ohio St.3d 568, 2017-Ohio-5833, the court states:

Although the commission may consider a claimant's nonparticipation in reeducation or retraining in its analysis of an injured worker's nonmedical disability factors, see *State ex rel. Wilson v. Indus. Comm.*, 80 Ohio St.3d 250, 253-254, 685 N.E.2d 774 (1997), when permanent total disability is based solely on the claimant's medical impairment, the commission is not required to consider nonmedical disability factors, State ex rel. *Gonzales v. Morgan*, 131 Ohio St. 3d 62, 2011-Ohio-6047, 960 N.E.2d 951, ¶ 18.

Because the commission decided the permanent-total-disability claim based solely on the claimant's medical impairment caused by the allowed conditions, it was not necessary for it to discuss the nonmedical disability factors. Thus, the commission did not abuse its discretion.

*Id.* at ¶ 18-19.

{¶ 68} Here, we have a situation similar to *R & L Carriers.* The commission, through its SHO, awarded PTD compensation based solely on claimant's allowed medical impairment and, thus, the commission was not required to consider non-medical disability

factors.  Therefore, the commission did not abuse its discretion with respect to re-education or retraining.

{¶ 69}  Based on the foregoing analysis with respect to relator's arguments, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.


/S/ MAGISTRATE
KENNETH W. MACKE


**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).